Ruth A. Tuttle v. Commissioner.
Tuttle v. Commissioner
Docket No. 45400.
United States Tax Court
T.C. Memo 1955-111; 1955 Tax Ct. Memo LEXIS 230; 14 T.C.M. (CCH) 394; T.C.M. (RIA) 55111; April 29, 1955
Charles S. Lyon, Esq., for the petitioner. Richard G. Maloney, Esq., and Robert J. Cowan, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in income taxes of petitioner as follows: Calendar Year
Deficiency
1948
$11,953.47
1949
12,499.96
1950
9,980.02 The question presented is whether petitioner is taxable upon income received and reported by the executor of an estate of which petitioner was the residuary beneficiary. Findings of Fact Some of the facts have been *231 stipulated and are hereby found. Petitioner, a resident of Canandaigua, New York, filed her individual income tax returns for the years 1948, 1949 and 1950 with the collector of internal revenue for the twenty-eighth district of New York. Eliza G. Tuttle, petitioner's mother and hereinafter sometimes called decedent, died testate on October 10, 1939. Under the will and codicils executed by decedent, the lands and premises occupied by the Canandaigua Dry Goods Company were specifically devised to petitioner. In addition, petitioner was named the sole residuary legatee and devisee of decedent's property after payment of debts and certain specific legacies. Assets owned by decedent at the date of her death consisted of the following items: Cash on deposit
$ 65,746.85
Real estate
136,300.00
Land contracts
15,009.00
Certificates of Deposit
15,062.50
Life insurance policies
97,250.00
Accounts receivable
10,039.09
Mortgages - Principal
$68,108.26
Int. accrued
1,714.82
69,823.08
Notes - Principal
565.00
Int. accrued
19.45
584.45
Bonds:
Interest
1 bond, City of Canandaigua, due 1940
$ 1,700.00
$19.43
1 bond, City of Canandaigua, due 1941
1,700.00
19.43
U.S. Postal Savings Bonds, due 1949
7,500.00
$10,900.00
$38.86
Silverware, jewelry and personal effects
$ 9,338.00
*232 Decedent did not own any stock on the date of her death. On November 21, 1939, letters testamentary were issued by the Surrogate's Court, Ontario County, State of New York, to John W. Linehan, the executor named in decedent's will, and Linehan has continued to act as the duly qualified executor from that time through the years in controversy. On or before December 31, 1941, he had paid or distributed all of the specific legacies and devises provided for in decedent's will and codicils, and by December 31, 1947 he had paid all debts and charges of the estate, except the balances owed to the following-named persons for attorney's and executor's services: James P. Donovan, Attorney's fees
$4,350.00
John W. Linehan, Executor, for
Commission on corpus
3,636.96
Shortly after he qualified, the executor was advised by his attorney that he was required by the applicable provisions of New York law to reduce the assets to cash and that he could not distribute the assets of the estate in kind to petitioner unless she consented thereto. She refused to accept distribution in kind, particularly the mortgages which made up a large part of decedent's estate. Thereafter, the *233 executor's activities were devoted to the liquidation of such assets. He was anxious to effect such liquidation and get the estate cleared up, but was faced with conditions which prevented immediate liquidation without sacrifice of value. At the time of the decedent's death, and continuing for a number of years thereafter, the market for real estate and mortgages was depressed. Lending institutions were primarily interested in liquidating existing mortgages rather than taking on new ones. The difficulties faced by the executor were worsened by rent control and mortgage moratorium laws. The mortgage moratorium law impeded his efforts to collect on mortgages which were owned by the decedent at the date of her death; the rent control law depressed the value of real property in the estate and impeded his efforts to sell at a fair price. He had difficulty collecting rents and interest and getting mortgagors to pay their taxes. With the assistance of his attorney, he attempted various procedures to promote liquidation of the real estate and mortgages. One procedure was to offer all mortgagors a write-down of 10 per cent of the principal of their mortgage if they would make a 10 per cent *234 cash payment and give a new mortgage for the reduced amount. The purpose of this was to create new mortgages which would not be subject to the moratorium law. In only three cases, however, was he able to put this program into effect. He also attempted to work out various types of land contracts where there was no market with available capital to buy for cash; and an attempt was made to sell property with no down payments under a lease-option plan. On the date of her death, decedent owned 16 pieces of real estate and 23 mortgages most of which were located in or were secured by real estate located in Rochester, New York. By January 2, 1946, all 16 parcels of real estate had either been sold by the executor or distributed to petitioner, 2 being distributed and the remaining 14 sold. On 7 of the 14 real properties that were sold the executor took back purchase money mortgages. Five of these 7 mortgages had been discharged or assigned prior to 1948; of the remaining 2 mortgages, 1 was discharged on November 1, 1948, and the other in December 1950; neither of these properties would have been regarded by a lending institution as a good loan property at the time these loans were made. As *235 a condition of making the sales which created these two remaining mortgages, the executor was required to take mortgages with 5-year terms; the purchaser in each case refused to give a mortgage for a lesser term. In one case the mortgage was paid off in 3 years, while in the other the mortgage was paid off on the due date after the executor refused the mortgagor's request for an extension. At the time of this refusal, the executor had asked petitioner if she would accept distribution of this mortgage. Of the 23 mortgages owned by decedent at her death, 18 were liquidated prior to 1948 by either assignment or discharge upon payment by the mortgagor. Of the 5 remaining mortgages, 2 were liquidated in 1948 and 3 were liquidated in 1950; and although 2 of these mortgages would have been attractive to a lending institution prior to 1948, 2 other mortgages would not have been attractive until later years. All of the mortgages held by the executor during the tax years involved had been acquired prior thereto and the executor's activity with respect to these mortgages during the tax years involved consisted of collecting the interest and principal payments on the mortgages. Liquidation of *236 the real estate and mortgages was completed in December 1950 when the largest single item, $19,500, collected during the year was received in complete liquidation of the largest mortgage granted by the estate. The executor never acquired any mortgages except those attributable to sale of original real estate or refinancing of existing mortgages. He never acquired any real estate except with respect to assets originally received in the form of mortgages or real estate. He was offered opportunities to take on wholly new mortgages, but never accepted any of the offers. The original real estate and mortgages which were still being liquidated as of the beginning of 1948 represented, in terms of value at death, over one-third of the real estate and mortgages which were to be liquidated by the executor. Assets held by the executor at the beginning of the calendar years 1948, 1949 and 1950 consisted of the following: 1948
1949
1950
Cash
$ 96,485.51
$126,381.63
$154,981.16
Mortgages
47,652.55
30,733.21
28,475.21
Bonds
7,500.00
7,500.00
Stocks
221,925.47
221,925.47
230,693.32
Total
$373,563.53
$386,540.31
$414,149.69
From 1939 to the middle of *237 the 1940's, very few of the lending institutions in the Rochester area were making any substantial amount of mortgage loans. From then on, depending upon the lending institution and the type of property, each year there was an increasing opportunity for making loans. During the period 1945 to 1948, the insurance companies had about completed the liquidation of the mortgages held by them and were beginning to make new mortgage loans. The sales of real estate and mortgages during this period were comparatively low, i.e., low when compared to the sales made in the 1920's and the latter part of the 1940's, but it was not impossible to sell real estate or to place a mortgage on property located in Rochester. The executor had been acquainted with the Tuttle family, both on a business and friendship basis, for the years involved herein and prior thereto. He had advised decedent on financial matters on two or three occasions prior to her death, and, after her death, he acted as advisor to petitioner. In 1947, an audit was made by the Bureau of Internal Revenue of the income tax returns of petitioner and the estate for the years 1943, 1944 and 1945. As a result, respondent proposed deficiencies *238 in income taxes against petitioner for the tax years 1942 through 1945 based upon the contention (a) that rental income from a business block in Canandaigua, New York, which had been specifically devised to petitioner, had erroneously been reported as income of the estate; and (b) all other net income reported by the estate should also have been included in the gross income of petitioner. This controversy involved no proposed deficiencies against the estate and was settled in October 1949 by (a) including in the gross income of petitioner the above-mentioned rental income; and (b) leaving undisturbed the remaining net income reported by the estate. On its Federal income tax returns filed by the executor with the collector of internal revenue for the twenty-eighth district of New York for the tax years 1948, 1949 and 1950, the estate reported income from the following sources and in the following amounts: 1948
1949
1950
Dividends
$16,845.00
$16,324.45
$17,138.70
Interest on
bank deposits,
notes, etc.
2,998.60
3,154.70
2,345.42
Interest on
Government
obligations
200.00
Miscellaneous
37.05
Net income on
sale of capi-
tal assets
4,490.70
Total
$20,043.60
$24,006.90
$19,484.12
*239 On her Federal income tax returns filed for the calendar years 1948, 1949 and 1950, petitioner reported gross income in the amounts of $49,754.56, $48,789.19 and $50,790.50, respectively, which income arose principally from dividends, rents and interest. None of petitioner's income represented income distributed from the estate, and the estate returns reported no amount of the estate income as distributable to petitioner. In 1951, the executor distributed and petitioner accepted all remaining assets of the estate, which at that time consisted of cash and stock, except one bank account of about $35,000 which was retained to pay the executor's and attorney's fees and any unknown liabilities. On June 20, 1951, petitioner executed an instrument releasing the executor from all liability and accountability to her and consenting to the entry of a decree discharging him without further accounting. On the same day, the executor petitioned the Surrogate's Court for his release and discharge as executor of decedent's estate, but on July 6, 1951 that Court denied the petition, without prejudice, because it appeared that the estate might be entitled to a refund of income taxes paid by the estate *240 on income herein alleged to be taxable to petitioner. During the years 1948 through 1950, the executor was engaged in the collection of assets of decedent, title to which was included in the estate when the executor qualified. The executor's activities during the years 1948 through 1950 were part of a continuous program which commenced shortly after his qualification, the purpose of which was to reduce the assets to cash in accordance with the requirements of law applicable to the estate. The activities of the executor were carried on by him diligently, in good faith, and without undue delay. Decedent's estate was in the process of administration and settlement during the years 1948 through 1950. Opinion The essential question is whether the income in controversy was received by the estate during the period of administration. This is to be determined not by resort to some theoretical situation created by state law or local decree. It is the time actually "required by the administrator to carry out the ordinary duties of administration, in particular the collection of assets and the payment of debts and legacies." This is the test "whether longer or shorter than the time specified *241 by statute. Regulations 111, sec. 29.161-2; , affd. ." . A contention might be made that during the years now in controversy the great bulk of the estate had been liquidated and was being retained by the executor in the form of other investments; that the preponderance of the income attributed by respondent to petitioner had its source in these investments rather than in the original assets remaining; and that for this reason at least the income not produced by the original assets was petitioner's rather than that of the estate. Respondent, however, makes no such contention, very possibly in view of the authorities typified by those already cited and of the explicit language of the statute. [1] We hence conceive it to be necessary to determine only whether the liquidation of the estate was still being carried on and whether that operation had not been unduly prolonged, , so that it can properly be said that this estate was actually in the process of administration in the sense that the collection of all the estate *242 assets and their distribution in cash could not sooner have been accomplished.
So narrowed we think the issue can be settled in but one way. The evidence convinces us and we have so found that circumstances compelled the executor to continue the administration throughout the years in issue, that there was no action he could have taken without jeopardizing the liquidation process which could legitimately have reduced all of the assets *243 to cash at any earlier time, and that accordingly the estate was in the process of administration throughout the critical period. We are not unmindful of respondent's suggestion that since petitioner was the sole remaining legatee she and the executor could have agreed to a distribution to her in kind of the remaining unliquidated assets. But as we read New York authorities neither she nor the executor was compelled to take this course. ; . Had it been done it would rather have been a method of shortening the administration by mutual agreement than a demonstration that nothing remained to be administered. Since it did not happen we reject respondent's arguments that we should treat it as though it had. Cases like , affd. (C.A. 1) , certiorari denied , which involve the extension of an administration to continue the conduct of a business are clearly inapposite. Liquidation is an essential part of the completion of administration. The extended operation *244 of a business is not. Nor can it validly be contended that petitioner should bear the burden of taxation on this income under section 22(a) on some theory comparable to that of the Clifford case [2] that she was in effectual control of the estate. . Without considering the intricacies of New York State law of the devolution of the real property and confining ourselves to the mortgages which the executor was required to liquidate and which as personal property are clearly within the ownership and control of the executor, we conclude that as of the end of the last taxable year the estate had not yet been fully administered and its income was not chargeable to petitioner. Decision will be entered under Rule 50. Footnotes
1. Internal Revenue Code of 1939. SEC. 162. NET INCOME. The net income of the estate or trust shall be computed in the same manner and on the same basis as in the case of an individual, except that - * * *
(c) In the case of income received by estates of deceased persons during the period of administration or settlement of the estate * * * there shall be allowed as an additional deduction in computing the net income of the estate * * * the amount of the income of the estate * * * for its taxable year, which is properly paid or credited during such year to any legatee, heir, or beneficiary, but the amount so allowed as a deduction shall be included in computing the net income of the legatee, heir, or beneficiary;↩
2. .↩